**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| CARLOS M. D., | : |
| Petitioner, | : Case No. 2:20-cv-3908 (BRM) |
| v. | : **OPINION** |
| WILLIAM J. ANDERSON, et al., | : |
| Respondents. | : |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 filed by Petitioner Carlos M. D. ("Petitioner").[1] (ECF No. 1.) Petitioner is an individual in the custody of the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE") who is detained in a facility in New Jersey during the pendency of his removal proceedings. On April 10, 2020, Petitioner filed his Petition (ECF No. 1), and on April 15, 2020, Petitioner filed a Motion for Temporary Restraining Order (ECF No. 8) requesting the Court order his immediate release from detention. Respondent filed Opposition to the Motion (ECF No. 10), and on April 22, 2020, the Court held oral argument. (ECF No. 13.)

In addition to his request for immediate release, Petitioner requests, *inter alia*, the Court to award reasonable attorney's fees and costs for this action. (ECF No. 1 at 24.)

---

[1] Petitioner is identified herein only by his first name and the first initials of his surname in order to address certain privacy concerns associated with § 2241 immigration cases. This manner of identification comports with recommendations made by the Judicial Conference of the United States' Committee on Court Administration and Case Management.

Having reviewed the Petition and the parties' submissions, heard oral argument, and examined the applicable law, Petitioner's Petition for Writ of Habeas Corpus and his Motion are **DENIED**.

**I. BACKGROUND**

    **A. COVID-19**

The Court need not re-state all that has been written in many court decisions throughout the country about the COVID-19 pandemic wreaking havoc around the world.[2] COVID-19 is "spread mainly from person-to-person" and can occur (1) between persons who are in close contact, meaning within six feet, and (2) by respiratory droplets when an infected person sneezes, coughs, or talks. *See Rafael L.O. v. Tsoukaris*, Civ. Action No. 20-3481, 2020 WL 1808843, at *2 (D.N.J. Apr. 9, 2020) (citing How Coronavirus Spreads, CENTERS for DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html (last visited May 7, 2020)). The virus can also be spread by infected persons who are not showing symptoms. *Id.*

Symptoms of COVID-19 can be mild, but as relevant here, the Centers for Disease Control and Prevention has identified several groups of individuals who are at higher risk for severe illness from COVID-19: individuals 65 years and older; nursing home/long-term care facility populations;

---

[2] *See*, *e.g.*, *United States v. Raia*, No. 20-1033, 2020 WL 1647922, at *1 (3d Cir. Apr. 2, 2020) (compassionate release request pursuant to 18 U.S.C § 3582(c)(1)(A)(i)); *Jeferson V. G. v. Decker*, 2020 WL 1873018 (D.N.J. Apr. 15, 2020); *Marvin A. G. v. Decker*, Civ. Action No. 20-1689 (D.N.J. Apr. 14, 2020); *Rafael L.O. v. Tsoukaris*, Civ. Action No. 20-3481, 2020 WL 1808843 (D.N.J. Apr. 9, 2020); *Bent v. Barr*, Civ. Action No. 19-06123, 2020 WL 1812850 (N.D. Ca., Apr. 9, 2020); *United States v. Patel*, Crim. No. 20-mj-14001, 2020 WL 1698785, at *1 (D.N.J. Apr. 8, 2020) (release request pursuant to 18 U.S.C. § 3142); *United States v. Veras*, Crim. No. 19-10, 2020 WL 1675975, at *3 (M.D. Pa. Apr. 6, 2020) (release request pursuant to 18 U.S.C. § 3142(i)); *Thakker v. Doll*, Civ. Action No. 20-480, --- F. Supp. 3d ---, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020); *Basank v. Decker*, Civ. Action No. 20-2518, --- F. Supp. 3d. ---, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020).

7

and those with underlying medical conditions such as chronic lung disease or moderate to severe asthma; serious heart condition; immunocompromised due to cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications; severe obesity; diabetes; chronic kidney disease undergoing dialysis; liver disease. *See* People Who Are at Higher Risk for Severe Illness, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Apr. 15, 2020).

### B. Petitioner's History

Petitioner, who is thirty-five years old, has been detained at the Essex County Correctional Facility ("ECCF") since approximately August 11, 2019. (ECF No. 1 at ¶¶ 19, 22.) Petitioner submits his weight and ethnicity place him at a higher risk of contracting COVID-19 or suffering severe effects of the virus, should he contract it. (*Id.* at ¶¶ 6-7.) Petitioner, who identifies as Afro-Brazilian and/or Black, cites to recent publications addressing the disproportionate effect of COVID-19 on African Americans. (*Id.* at ¶ 8.) Petitioner is 5'7 and weighs 180 pounds. (*Id.* at ¶ 89.) He submits that according to the Centers for Disease Control's ("CDC") adult body mass index ("BMI") calculator, his BMI is 28.2. (*Id.*) Petitioner does not allege to have any underlying health conditions. (*Id.* at ¶ 4.)

Petitioner is a native and citizen of Brazil who is subject to discretionary detention under 8 U.S.C. § 1226(a). (ECF No. 10 at 9.) On August 10, 2019, Petitioner was arrested by Newark, New Jersey police for domestic violence-related offenses in violation of New Jersey state law. (ECF No. 10-9 at 3.) On August 19, 2010, Petitioner was served with a notice to appear charging him as an alien present in the United States without being admitted or paroled, or who arrived in

7

the United States at any time or place other than as designated by the Attorney General. (ECF No. 10-8 at 3-4.)

On September 26, 2019, an Immigration Judge ("IJ") denied Petitioner's request for a bond redetermination, citing the danger he would pose, in light of the allegations in the then-pending criminal case. (ECF No. 10-6 at 8.) Also on September 26, 2019, the criminal complaint against Petitioner was administratively dismissed in the Superior Court of New Jersey, Essex County. (*Id.*) On November 26, 2019, an IJ denied Petitioner's request for bond redetermination, finding that Petitioner "failed to show he is no longer a danger to the community." (*Id.*) With respect to the documents submitted to show Petitioner's criminal case was dismissed, the IJ found "these documents do not indicate that the alleged incident did not occur; rather, they merely show that the prosecutor declined to pursue the criminal charges. . . . Moreover, Respondent has produced neither the police report of the incident nor any testimony from his ex-girlfriend about the event." (*Id.*) The IJ also opined, "Respondent has not explained how the administrative dismissal of the charges reflects a material change in circumstances that would impact the prior determination that he is a danger to the community." (*Id.*) Petitioner's appeal of the IJ's decision to the Board of Immigration Appeals ("BIA") was dismissed on March 17, 2020. (ECF No. 1-8.) In its decision, the BIA indicated it agreed with the IJ that Petitioner's evidence "did not constitute a material change in circumstances." (*Id.* at 3.)

In addition to his multiple bond proceedings, Petitioner also came before an IJ on December 10, 2019, for his removal proceedings. (ECF No. 1-7.) At that proceeding, Petitioner testified in support of his asylum application, which he filed on the basis of his fear of persecution due to his race. Before denying the application and ordering Petitioner removed, the IJ questioned Petitioner about whether he would be considered Black in light of his physical appearance. (*Id.* at

7

105-106.) Petitioner appealed that decision to the BIA on March 6, 2020. (ECF No. 1 at ¶ 57.) Petitioner asserts that the IJ's line of questioning was inappropriate and she was not an impartial arbiter. (ECF No. 1 at 14.)

On April 2, 2020, ICE denied Petitioner's request for release from custody for humanitarian reasons. (ECF No. 1-15.) In the written decision, the ICE Field Director provided that his review of Petitioner's medical records indicated Petitioner's medical concerns were being "properly managed" at ECCF. (*Id.*)

Petitioner subsequently filed the instant habeas petition and Motion. While the instant matter was pending, Respondents filed a letter with the Court indicating that he underwent a rapid COVID-19 screening on April 24, 2020, that indicated he may be positive for the presence of IgM and IgG antibodies. (ECF No. 15 at 1.) Respondents clarified that the rapid test results could mean "he is (1) positive for COVID-19; (2) still fighting the virus (+IgM reading); and (3) developing immunity (+IgG reading)." (*Id.*) As of the date of that filing, Respondents were unaware whether Petitioner underwent a full COVD-19 laboratory test. (*Id.* at 2.) The parties have not submitted updated medical information about Petitioner since that filing.

**C. Conditions at ECCF**

Petitioner submits his detention prevents him from employing the most effective way of preventing COVID-19, which is social distancing. (ECF No. 1 at ¶ 2.) He is housed in a dorm with forty-three other detainees, some of whom he claims are exhibiting symptoms of COVID-19. (*Id.* at ¶ 90.) Petitioner also provides detainees are not provided masks, and the facility is not adequately cleaned. (ECF No. 8-1 at 15, 19.)

In response to the pandemic, ICE has taken affirmative steps to lessen the risk of exposure. *ICE Guidance on COVID-19*, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,

7

https://www.ice.gov/coronavirus (last visited on May 7, 2020). For example, ICE temporarily suspended all social visitation at detention facilities. *Id.* ICE also released approximately 160 individuals who were over the age of 60 or pregnant. *Id.* ICE further instituted screening guidance for new detainees and indicates that it is testing detainees for COVID-19 per CDC guidance. *Id.*

Respondents submitted declarations from ECCF warden, Alfaro Ortiz. (ECF No. 10-7.) As of the date of Ortiz's declaration dated April 20, 2020, he confirmed the following number of COVID-19 cases. First, two ICE detainees had tested positive for COVID-19, were both treated at University Hospital, cleared for discharge, and are both now in isolation at ECCF. (*Id.* at ¶ 31.) Additionally, five county inmates tested positive,[3] as well as fifty-five members of the correctional staff, of which only nine have been cleared to resume work at the facility. *Id.*

In his declaration, Warden Ortiz details the efforts of ECCF to deal with the virus. A major component has been keeping the population well below capacity in order to ensure adequate space to practice social distancing. He reports that, among other things, ECCF is currently at less than 75 percent of its maximum capacity, and the ICE detention areas that are normally configured to house 60 detainees per pod, are now reduced to a maximum of 48 detainees. (ECF No. 10-7 at ¶¶ 4-5.) Moreover, the pods allow for all detainees to sit at least six feet apart. (*Id.* at ¶ 6.) Inmates' recreation periods have been modified to allow for fewer inmates to have recreation at the same time, thereby facilitating social distancing. (ECF No. 10-7 at ¶ 16.)

Social visits were suspended on March 22, 2020, and attorney visits can now be arranged in a dedicated room within the visitor's lobby wired to support video conferencing between the detainee and his attorney. (*Id.* at ¶ 16.)

---

[3] County inmates are housed in Delaney Hall, a separate building across the street from where immigration detainees are housed. (ECF No. 10-7 at ¶ 31.)

7

Health care at the facility is administered by CFG Health Systems and an on-site physician director (who is available twenty-four hours), as well as several RNs, LPNs, nurse practitioners and physician assistants. (*Id.* at ¶ 10.) There is always a nurse practitioner in the facility twenty-four hours a day, and a physician at the facility sixteen hours a day. (*Id.*) A physician is on call on a twenty-four-hour basis for emergency needs. (*Id.*) The medical department has also established a new protocol for handling inmates/detainees who may suffer from health conditions that would classify them as being at a high risk of suffering severe complication from COVID-19, by housing them separately. (*Id.* at ¶ 33.) ECCF requires that all detainees and inmates undergo medical screening including temperature readings before admission in the facility. (*Id.* at ¶ 8.)

If a detainee complains of COVID-19 symptoms, he is immediately evaluated, and if that person exhibits COVID-19 symptoms, he is provided a surgical mask. (*Id.* at ¶ 17.) Moderately to severely symptomatic detainees are immediately taken to University Hospital for medical evaluation or COVID-19 testing. (*Id.* at ¶ 18.) Those who test positive, but who do not require hospitalization, are quarantined in their own cell in a unit that is exclusively being used for inmates/detainees with positive COVID-19 results. (*Id.*) Asymptomatic detainees who have had a known exposure to COVID-19 are "co-horted" with other similarly situated detainees for fourteen days. (*Id.* at ¶ 21.)

ECCF also educates detainees as to the "importance of hand washing and best practices to prevent the spread of COVID-19." (ECF No. 10-7 at ¶ 15.) Detainees have unlimited access to soap and water and they can also request disinfectant solution to clean surfaces. (*Id.* at ¶ 23.) This cleaning solution is stored in a secured place due to its high-bleach content. (*Id.*) ECCF receives soap delivery every three days, which has resulted in the warehouse having an eleven-month supply of soap. (*Id.* at ¶ 24). Additional cleaning staff have been hired in order to increase the

frequency of cleaning each day. (*Id.* at ¶ 16.) ECCF was designed with air handlers and a purge system in every housing unit that allows for fresh air to be circulated within the facility every four hours. (*Id.* at ¶ 13.)

In mid-March 2020, ECCF contracted with a lab to acquire fifty COVID-19 testing kits. (*Id.* at ¶16.) ECCF is expanding its COVID-19 testing to include "rapid COVID-19 testing" blood-testing to avoid risk to health care workers who may be at risk due to coughing or sneezing by the person being tested. (*Id.* at ¶ 32.) On March 26, 2020, ECCF received 1008 Tyvek suits, 1200 N95 masks, and 29,900 surgical masks which correctional officers use when working with high-risk detainees. (*Id.* at ¶¶ 16, 33.)

## II. LEGAL STANDARD

Injunctive relief is "an extraordinary remedy" and "should be granted only in limited circumstances." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426-27(3d Cir. 1994) (internal quotation marks omitted); *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). To obtain a temporary restraining order the moving party must show:

> [W]e follow our precedent that a movant for preliminary equitable relief must meet the threshold for the first two "most critical" factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief. If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

The Court starts its discussion with an examination of the Supreme Court's case in *Helling v. McKinney*, 509 U.S. 25, 33 (1993). In *Helling*, the plaintiff was a prisoner whose cellmate was a heavy smoker. Plaintiff filed a civil rights action arguing he had been involuntarily exposed to

7

levels of secondhand smoke that posed an unreasonable risk of harm to his future health. While weighing plaintiff's conditions of confinement claim, the Court recognized inmates are entitled to relief under the Eighth Amendment where they prove threats to personal safety from the exposure to serious contagious diseases. *Helling*, 509 U.S. at 33 (noting that the Eighth Amendment requires a remedy when "inmates in punitive isolation were crowded into cells and some of them had infection maladies such as hepatitis and venereal disease" (citing *Hutto v. Finney*, 437 U.S. 678, 682 (1978))). The Court further held: "Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms." *Id.*

Though *Helling* is a conditions of confinement claim by a sentenced prisoner, and therefore arises under the Eighth Amendment, its reasoning is nonetheless relevant here in the context of an immigration detainee. Because Petitioner is a detainee, not a convicted prisoner, his claim is one grounded in due process, not the Eighth Amendment. The Third Circuit has made clear immigration detainees are entitled to the same due process protections as pre-trial detainees when raising conditions of confinement due process claims. *E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019). "[W]hen pretrial detainees challenge their conditions of confinement, we must consider whether there has been a violation of the Due Process Clause . . . ." *Hubbard v. Taylor*, 538 F.3d 229, 231 (3d Cir. 2008). "In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Specifically:

> Under *Bell*, a "particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally

7

> related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose."

*Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012) (quoting *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007)). The Court's "inquiry into whether given conditions constitute 'punishment' must [] consider the totality of circumstances within an institution." *Hubbard*, 399 F.3d at 160 (citing *Union Cnty. Jail Inmates v. DiBuono*, 713 F.2d 984, 996 (3d Cir. 1983)).

## III. DECISION

The Court finds that Petitioner has not established a reasonable likelihood of success on the merits and is not entitled to preliminary injunctive relief.

In order to meet the first prong, the party seeking the injunction "must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not)." *Reilly*, 858 F.3d at 179. Under 28 U.S.C. § 2241(c), habeas relief "shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).

A federal court has subject matter jurisdiction under § 2241(c)(3) if two requirements are satisfied: (1) the petitioner is "in custody," and (2) the custody is alleged to be "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). The Court has subject matter jurisdiction over this matter under § 2241 because, at the time he filed his petition, Petitioner was detained within its jurisdiction by a custodian within its jurisdiction. *See Spencer v. Kemna*, 523 U.S. 1, 7 (1998) and *Braden v. 30th Judicial Circuit Court*, 410 U.S. 484, 490-95, 500 (1973).

In Petitioner's § 2241 petition, he raises two claims surrounding the legality of his detention. He first argues his last bond hearing before an IJ violated his due process rights. (ECF No. 1 at ¶¶ 100-01.) In his second claim, Petitioner argues ECCF has violated his constitutional

rights by depriving "him the ability to practice reasonable medical procedures to safeguard his health" and consequently exposed him to serious medical harm. (*Id.* at ¶ 103.) Respondents, on the other hand, argue Petitioner has not established his bond hearing was constitutionally inadequate. (ECF No. 10 at 22-23.) Furthermore, they argue he has not shown how ECCF has violated his rights in light of the numerous measures employed to prevent the spread of COVID-19 amongst its population. (*Id.* at 30.)

### A. Petitioner's Bond Redetermination Hearing

Petitioner argues that his October 24, 2019 bond redetermination hearing, particularly the IJ's improper burden shifting to the Petitioner, resulted in a violation of his constitutional rights. (ECF No. 1 at ¶¶ 42-45.)

After Petitioner's October 24, 2019 bond hearing, the IJ issued a written memorandum decision explaining the denial. (ECF No. 10-5.) The IJ explained in relevant part as follows:

> After considering the recently submitted evidence, the Court finds that Respondent has failed to show he is no longer a danger to the community. Respondent, through counsel, submitted evidence of an administrative dismissal of the criminal charges against him. *See* Resp't Mot. For Custody Redetermination under CFR 1003.19(e); R. of Disposition, Case No. 19006554-001. However, these documents do not indicate that the alleged incident did not occur; rather, they merely show that the prosecutor declined to pursue the criminal charges. *See* N.J. CT. R. 3:25-1(a). Furthermore, while Respondent also relies upon the previously submitted letter from his ex-girlfriend, that letter does not directly dispute the allegations detailed in the criminal complaint. *See* Resp't Mot. For Custody Redetermination, Tab A; DHS Evid., pp. 5-7. Moreover, Respondent has produced neither the police report of the incident nor any testimony from his ex-girlfriend about the event. Notably, Respondent has not explained how the administrative dismissal of the charges reflects a material change in circumstances that would impact the prior determination that he is a danger to the community.

(ECF No. 10-5 at 106.)

Petitioner appealed the bond denial on December 20, 2019, and the BIA dismissed the

appeal on March 17, 2020. (ECF Nos. 1-4, 10-6.) Petitioner submits that contrary to the IJ's burden-shifting, the government bears the burden of proving by clear and convincing evidence that Petitioner is a danger to others or a flight risk. (*Id.* at ¶ 100.)

Although this Court may not review an IJ's discretionary determination, *see* 8 U.S.C. § 1226(e), it may review "the legal standard underlying immigration officials' actions and to evaluate legal and constitutional claims on that basis." *Quinteros v. Warden Pike Cnty. Corr. Facility*, 784 F. App'x 75, 77 (3d Cir. 2019).

> "[T]he Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). The Supreme Court has repeatedly recognized that "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Demore v. Kim*, 538 U.S. 510, 521, 123 S. Ct. 1708, 155 L. Ed. 2d 724 (2003) (citation omitted). At the same time, the Court has found limits on that power. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 690, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001) (concluding that "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem").

*Borbot v. Warden Hudson Cnty. Corr. Facility*, 906 F.3d 274, 276 (3d Cir. 2018).

When examining whether the administrative proceeding complied with the detainee's due process rights, the Court considers the following three criteria: (1) whether the alien was "entitled to factfinding based on a record produced before the decisionmaker and disclosed to him or her; (2) [that alien is] allowed to make arguments on his or her own behalf; and (3) has the right to an individualized determination of his or her interests." *Quinteros*, 784 F. App'x at 78.

Generally, detainees held pursuant to 8 U.S.C. § 1226(a) bear the burden of proof throughout the course of their detention. *Borbot*, 906 F.3d at 279.

Nonetheless, when issuing the decision in Petitioner's case, the IJ cited to 8 C.F.R. § 1003.19(d), which provides in relevant part that a bond determination is "[b]ased upon any

7

information that is available to the [IJ] or that is presented to him or her by the alien or the Service." (ECF No. 10-5 at 4). Contrary to Petitioner's assertion that the IJ improperly shifted the burden of proof to Petitioner, the Court finds that the IJ considered all of the information before it and mentioned that additional information in support of Petitioner's argument may have impacted the determination. Moreover, Petitioner has not argued, and the record does not reflect, that the bond redetermination hearing did not comport with the previously listed criteria required to comply with due process. All three of those requirements were met at his hearing. In the event that Petitioner is challenging the IJ's determination that Petitioner continued to pose a danger to the public, that is a discretionary decision that this Court will not review.

Petitioner's claim is therefore denied.

**B. Petitioner's Conditions of Confinement Claim**

Petitioner next submits that the conditions at ECCF require his immediate release as he is unable to adequately prevent COVID-19 infection. He further submits the facility conditions coupled with the possible severe effects of the virus if he becomes infected because of his weight and ethnicity, has caused him mental anguish. (ECF No. 8-1 at 12.)[4] The Court notes that when this matter was filed, Petitioner was not reported to have tested positive for COVID-19. Since that time, Petitioner's rapid screening results from April 24, 2020, indicates the presence of certain antibodies which may mean he has contracted COVID-19. (ECF No. 15.) However, Petitioner has not provided the Court with any current information about his health status since the results of the rapid screening were reported almost two weeks ago.

Since the start of COVID-19's spread throughout this country, district courts considering

---

[4] Petitioner only refers to deliberate indifference in his underlying habeas petition (ECF No. 1 at 5, 23), not in his Motion.

7

similar filings from detainees have conducted very fact sensitive analyses of each detainee's claims and each facility's response to the pandemic. Courts have considered the facility conditions and whether detainees' health conditions place them in a population that is more vulnerable to contracting the virus or suffering severe effects if they contract the virus. *See Kevin M.A. v. Decker*, Civ. Action No. 20-4593, --F. Supp. 3d --, 2020 WL 2092791 at *9 (D.N.J. May 1, 2020); *see also United States v. Owens*, Crim. Action No. 19-81, 2020 WL 1891829 at *2 (W.D. Pa. Apr. 16, 2020).

Here, Petitioner submits that he is overweight with a BMI of 28.5 and that he is Afro-Brazilian or Black. As for Petitioner's claim that he is in an at-risk population by virtue of being overweight, Petitioner's reported BMI is below what the CDC's COVID-19 risk factors qualifies as severe obesity, which is qualified as a BMI greater than or equal to 40. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 6, 2020). Petitioner has not claimed to be living with any health condition or ailment that his weight has contributed to and the Court does not find a basis to grant relief, solely on the basis of his weight.

Similarly, Petitioner's claim that COVID-19's disproportionate impact on African-Americans merits relief, equally fails. The Court by no means seeks to undermine Petitioner's claim that certain populations including African-Americans have been disproportionately affected by the virus. However, Petitioner has not made a sound argument as to how or even if the disturbing data regarding COVID-19's impact on African-Americans inherently designates all who are identified as African-Americans and/or Black people, as belonging to a vulnerable population. The Court considered the information Petitioner cited in support of this particular argument, and notes much of the commentary on this issue focuses on the plethora of reasons including healthcare

7

inequality and pre-existing health conditions which historically disproportionately impact African-Americans.[5] Petitioner has not established the link between what may be a pre-existing racial disparity in this country and how it would impact his ability to prevent infection or suffer from the severe effects if he is infected with COVID-19. Additionally, to date, the CDC has not designated members of any particular ethnic and/or racial group to be particularly prone to the adverse effects of COVID-19. Consequently, the Court is not swayed by Petitioner's argument based on his weight or race.

Petitioner's age and the absence of any underlying health conditions do not place him in a high-risk category. *See Bentick v. Decker*, Civ. A. No. 20-3679, 2020 WL 2079300 at *9 (D.N.J. Apr., 30, 2020) (denying relief to a twenty-five-year-old and twenty-two-year-old detainee respectively, one of which claimed to have a BMI of greater than or equal to 30.) Moreover, the information that Respondents provided reflects that since March, ECCF has implemented extensive measures to counteract the virus. As a result, Petitioner has not shown that the legitimate governmental interest has been overcome.[6] Petitioner's claim is therefore denied.

For these reasons, the Court finds that Petitioner has not shown a substantial likelihood of success on the merits of his Petition for Writ of Habeas Corpus. Because Petitioner's request for injunctive relief fails to meet the first element, the Court does not reach the remaining three

---

[5] *See* Sherita Hill Golden, *Coronavirus in African Americans and Other People of Color*, www.HopkinsMedicine.org, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/covid19-racial-disparities (last visited May 6, 2020); *see also Why The Coronavirus is Hitting Black Communities Hardest,* www.NPR.org, https://www.npr.org/transcripts/832238018 (last visited May 6, 2020).

[6] To the extent that Petitioner may also be making a deliberate indifference claim, he has not made any arguments nor cited to any facts in support of this claim-i.e. that Respondents "knew of and disregard[ed] an excessive risk to inmate health or safety." *Natale*, *v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 82 (3d Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

requirements. *See Reilly*, 858 F.3d at 179.

### IV. CONCLUSION

Accordingly, Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241, as well as the Motion are **DENIED** without prejudice. (ECF Nos. 1, 8.) Because Petitioner's habeas petition and Motion are denied, he is not entitled to attorney fees and costs.[7]

An appropriate order will follow.

Dated: May 14, 2020

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**

---

[7] *See* Equal Access to Justice Act, ("EAJA"), 28 U.S.C. § 2412(d)(1)(A).

7